UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DAVID ANDREW RODENBECK,

          **Plaintiff,**

   **v.**

NATIONWIDE INSURANCE,

          **Defendant.**

**Case No. 2:19-cv-204**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Elizabeth Preston Deavers**

<u>**OPINION AND ORDER**</u>

The matter before the Court is Defendant Nationwide Insurance's ("Defendant" or "Nationwide") Motion for Summary Judgment (ECF No. 37). Plaintiff David Andrew Rodenbeck ("Plaintiff") responded (ECF No. 39), Defendant replied (ECF No. 40), and Plaintiff sur-replied (ECF No. 46). Additionally, Plaintiff filed a Motion Requesting a Jury Trial (ECF No. 43). For the following reasons, Defendant's motion (ECF No. 37) is **GRANTED** and Plaintiff's motion (ECF No. 43) is **DENIED**.

## I.

On September 12, 2016, Modis, a company which recruits and assigns individuals to positions in the information technology ("IT") field, hired Plaintiff as an at-will employee. (Rodenbeck Dep. Exs. 4, 6, ECF No. 36.) Modis placed Plaintiff in Nationwide's IT department as a Requirements Analyst. (*Id.* Ex. 12; Blake Decl. ¶ 5, ECF No. 37-1; Sayer Aff. ¶ 1, ECF No. 37-2.) The maximum length of the assignment was 18 months. (Blake Decl. ¶ 6.) Kennerly Sayre, a Modis employee working at Nationwide, oversaw contingent workers such as Plaintiff. (Rodenbeck Dep. 107:5–20; Sayer Aff. ¶ 2.) Cynthia Blake, a Nationwide Manager in IT Analysis, assigned projects to those contingent workers. (Blake Decl. ¶ 4.) Plaintiff believes Modis employed him, not Nationwide. (Rodenbeck Dep. 41:1–6, 43:4–7, 106:8–13.)

Plaintiff began in Nationwide's Retirement Plans team.  (*Id.* 111:14–17.)  Within a few months Ryan Skoglund, a Nationwide manager in IT Analysis, began receiving negative feedback about Plaintiff's performance.  (Skoglund Decl. ¶ 3, ECF No. 37-3.)  "Plaintiff's team members reported that while Plaintiff was able to perform tasks if told specifically what to do, he was not analytically strong or able to develop his own solutions to problems, an essential function of his job."  (*Id.*)  Mr. Skoglund, believing this was due to a learning curve, instructed Plaintiff's team to coach him and provide him additional assistance and direction, which they did.  (*Id.*)  Plaintiff admitted he had never previously held a Requirements Analyst position.  (Rodenbeck Dep. 67:5–68:12, 71:6–73:2.)  Plaintiff lied about his work experience and qualifications on his resume and in his LinkedIn profile.  (*Id.*)

In May of 2017, Plaintiff began actively seeking full-time employment with Nationwide. (*Id.* 119:13–17.)  Around this time, Ms. Blake "began receiving complaints that multiple managers in the IT Departments were complaining about Plaintiff aggressively reaching out to them to schedule meetings [] to discuss job shadowing and open positions within Nationwide."  (Blake Decl. ¶ 8.)  These managers reported Plaintiff's behavior was "burdensome and disruptive to their work."  (*Id.*)

In June of 2017, Plaintiff's position in the Retirement Plans team was eliminated. (Rodenbeck Dep. 112:20–113:9.)  Ms. Blake and Mr. Skoglund placed Plaintiff with the Customer Service and Billing ("CSB") team.  (*Id.* 113:10–11; Skoglund Decl. ¶ 4; Blake Decl. ¶ 7.)  Plaintiff was still performing below expectations, but Mr. Skoglund and Ms. Blake redeployed Plaintiff "with the hope that he could be successful in [the CSB team]."  (Skoglund Decl. ¶ 4.)  Mr. Skoglund met with Plaintiff to discuss the transfer and told Plaintiff he "needed to work harder and improve his work product."  (*Id.* ¶ 5.)  Plaintiff thanked Mr. Skoglund for the feedback and

"quickly changed the topic to his desire to become a Nationwide employee, asking Mr. Skoglund to help him secure interviews for various positions to which he had applied." (*Id.*)

On June 26, 2017, Ms. Blake told Plaintiff that while he could apply for Nationwide positions, he should stop reaching out to managers and interfering with their work. (Blake Decl. ¶ 9.) Plaintiff acknowledged the behavior would not continue. (*Id.*; Rodenbeck Dep. 177:13–18.) Less than one-month later, Ms. Blake received complaints that Plaintiff was leaving his workstation for extended time periods to conduct job shadowing and other networking activities. (Blake Decl. ¶ 10.)

Ms. Blake relayed the issues to Ms. Sayre, noting that if another inappropriate incident was brought to her attention, she would release Plaintiff from his assignment. (*Id.* ¶ 11.) On July 25, 2017, Ms. Sayre met with Plaintiff and told him he should not network with Nationwide management and should not bill time to a project if he was not working, another issue Ms. Blake had relayed. (Sayre Aff. ¶¶ 4–7; Rodenbeck Dep. 183:1–184:14, 192:22–193:8.) During this meeting, Plaintiff stated he acts impulsively because he has bipolar disorder. (*Id.* ¶ 8; Rodenbeck Dep. 184:15–186:8.) Plaintiff asked that Nationwide excuse the inappropriate behavior. (*Id.*; Rodenbeck Dep. 184:15–186:8.) Ms. Sayre emailed Ms. Blake this information. (Rodenbeck Dep. Ex. 26; Blake Decl. ¶ 12.)

On August 10, 2017, Plaintiff emailed his co-worker Sean Cary stating that he had bipolar disorder and requesting that Mr. Cary come to him personally if Plaintiff ever made a mistake. (*Id.* 214:6–12, Ex. 29.) Mr. Cary agreed. (*Id.* 215:15–17, Ex. 29.) On September 11, 2017, Plaintiff emailed another co-worker, Elizabeth Rich, with a similar request. (*Id.* 215:21–216:19., Ex. 29.) Ms. Rich seemed to agree. (*Id.* Ex. 29.) On October 4, 2017, Plaintiff emailed two more co-workers, Dawn Logan and Dana Bull, with similar requests. (*Id.*) Again, both agreed. (*Id.*)

The email to Ms. Logan and Ms. Bull was forwarded to other CSB team members and eventually reached Ms. Blake.  (Pl.'s Resp. at 5–7.)  Ms. Blake responded that she found Plaintiff's email "disturbing."  (*Id.* at 5.)  Ms. Blake found the request patently unreasonable as it asked Plaintiff's co-workers to hide his poor performance.  (Blake Suppl. Decl. ¶ 6, ECF No. 40-1.)

Throughout August, September, and October of 2017, several of Plaintiff's team members complained that Plaintiff's work lacked analytical detail and had errors, he failed to follow directions, and he skipped steps.  (Bull Decl. ¶ 3, Exs, D-2–D-4, ECF No. 37-4; Cox Decl. ¶ 4, Ex. E-1, ECF No. 37-5.)  As a result, Plaintiff's team had to correct his work.  (*Id.*; Cox Decl. ¶ 4, Ex. E-1.)  Plaintiff's team members also complained that Plaintiff continued to be away from his workstation for extended periods and spent extended time on non-work related websites.  (*Id.*; Cox Decl. ¶ 4, Ex. E-1.)  Near the end of September of 2017, the CSB team requested that Plaintiff be removed from a high-profile project due to his poor performance.  (Cox Decl. ¶ 5.)  Ms. Blake received these complaints.  (*Id.* ¶ 6, Blake Decl. ¶ 13.)

On October 9, 2017, Plaintiff gave his co-worker Mr. Cary a note from a nurse practitioner, which stated Plaintiff "may work from home, up to 5 days per week, as needed."[1]  (Rodenbeck Dep. 220:23–221:3, Ex. 30.)  Plaintiff did not give the note to anyone from Modis or Ms. Blake.  (*Id.* 221:22–222:1–3; Blake Decl. ¶ 16.)

On October 10, 2017, Ms. Blake, in consultation with Nationwide's Office of Associate Relations, released Plaintiff from his assignment.  (Blake Decl. ¶ 16; Rodenbeck Dep. 236:1–3.)  Plaintiff believes he was released due to his "[p]oor performance."  (Rodenbeck Dep. 237:23–

---

[1] On January 24, 2018, Plaintiff obtained a letter from his nurse practitioner stating the October 9th note was in error and Plaintiff "may work without restriction or accommodation."  (Rodenbeck Dep. 230:20–231:11, Ex. 31.)  Plaintiff testified he obtained this second note in order to obtain unemployment compensation.  (*Id.* 231:14–232:3.)  Plaintiff also admitted, however, that he did need to work from home but asked his nurse practitioner to misrepresent the truth so he could obtain unemployment compensation.  (*Id.* 232:9–12.)

238:4.)  On October 12, 2018, Plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") alleging that Nationwide released him because of his disability.  (*Id.* 241:14–17, Ex. 32.)

In March of 2018, Plaintiff applied for two positions with Nationwide: Vice President of Individual Products and Solutions Business Development and Associate Vice President of Nationwide Financial Risk Management.  (*Id.* 244:9–23.)  Rebecca Rhubottom, Nationwide's Associate Vice President of Executive Recruiting, determined from Plaintiff's resume that he did not have the requisite experience and qualifications for either position and thus, she did not select him.  (Rhubottom Decl. ¶¶ 2–3, 6, ECF No. 37-6.)  Ms. Rhubottom was not aware of Plaintiff's alleged disability or that he had previously filed a charge of discrimination against Nationwide. (*Id.* ¶ 8.)  Nationwide selected internal candidates for both positions whom had the requisite experience and qualifications.  (*Id.* ¶¶ 4, 7, Exs. F-1, F-2.)  On April 5, 2018, Plaintiff filed another charge of discrimination with the OCRC alleging Nationwide failed to hire him because he engaged in protected conduct.  (Rodenbeck Dep. Ex. 32.)

On January 22, 2019, Plaintiff filed a Complaint against Nationwide asserting nine claims.[2] These claims are: (1) disability discrimination in violation of the Americans with Disabilities Act ("ADA"); (2) disability discrimination in violation of Ohio Revised Code § 4112; (3) harassment through a hostile work environment in violation of the ADA; (4) harassment through a hostile work environment in violation of § 4112; (5) retaliation for protected conduct in violation of the ADA; (6) retaliation for protected conduct in violation of § 4112; (7) failure to hire in violation of the ADA; (8) failure to provide accommodations in violation of the ADA; and (9) wrongful

---

[2] On August 12, 2019, the Court allowed Plaintiff to amend his Complaint to include an additional allegation.  This allegation relates to Plaintiff's seventh claim for failure to hire, and thus, need not be considered an entirely new claim.

termination in violation of the ADA. (*See* Compl., ECF No. 1.) Defendant now moves for summary judgment on all nine claims.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n.*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

**III.**

The nine counts in the Complaint can be combined into four groups based on the applicable law: (A) disability discrimination in violation of the ADA and Ohio law (Counts I, II, and IX);[3] (B) failure to accommodate in violation of the ADA (Count VIII); (C) harassment causing a hostile work environment in violation of the ADA and Ohio law (Counts III, IV); and (D) retaliation for protected conduct in violation of the ADA and Ohio law (Counts V, VI, VII and IX). "Since the 'analysis of claims made pursuant to the [ADA] applies to claims made pursuant to Ohio Revised Code § 4112.02[,] the Court will evaluate the Ohio claims 'concurrently and under the same standards as claims brought under the ADA.'" *Denoewer v. Union Cty. Indus.,* No. 2:17-cv-660, 2020 U.S Dist. LEXIS 44966, at *8 (S.D. Ohio Mar. 16, 2020) (citing *Niles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 367–68 (6th Cir. 2013)); *see also Sharp v. Waste Mgmt.*, 47 F. Supp. 3d 584, 599 n.2 (S.D. Ohio 2014) (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1104 n.3 (6th Cir. 2008) ("Plaintiff's claims under Ohio law are analyzed under the same framework as his ADA claim.")). Before turning to these four groups, the Court will address Plaintiff's argument that Defendant's entire motion should be denied because Defendant engaged in tactics and Defendant's argument that almost the entire motion should be granted because it did not employ Plaintiff.

In Plaintiff's response to Defendant's motion he claims that Defendant hid facts from him and engaged in "stalling tactics." (Pl.'s Resp. at 1, ECF No. 39.) Plaintiff argues that because he is pro se and does not know the nuances of the legal system Defendant's motion for summary judgment should be "thrown out." (*Id.*) Defendant notes that it mailed a courtesy copy of its

---

[3] Counts I and II are broad and encompass many of the subsequent more specific counts. The Court addresses Count I and II specifically with regards to the allegation not covered by the other claims, discrimination through termination of employment because of a disability. The remaining allegations in Counts I and II include retaliation, harassment, and failure to accommodate which are addressed in the subsequent counts.

motion to Plaintiff and filed it within the deadline set by the Court.  Plaintiff's argument is without merit.  Plaintiff provides no evidence that Defendant hid evidence or tried to stall.  While the Court is sensitive to the fact that Plaintiff is proceeding pro se and may not be aware of the nuances of the legal system, there is no evidence that Defendant engaged in any wrongdoing which would affect the Court's decision on the motions currently before it.

Defendant argues that it is entitled to summary judgment on all claims except failure to hire, because it was not Plaintiff's employer.  (Def.'s Mot. Summ. J. at 12, ECF No. 37.)  In order to hold Defendant liable, Plaintiff must show Defendant was his "employer" as defined in the employment discrimination statutes.  *See Swallows v. Barnes & Noble Book Stores*, 128 F.3d 990, 992–93 (6th Cir. 1997).  The Sixth Circuit has provided, however, that while "a direct employment relationship provides the usual basis for liability . . . courts have fashioned various doctrines by which a defendant that does not directly employ a plaintiff may still be considered an 'employer' under those statutes."  *Id.* at 993.  These include, for example, two entities that are so interrelated they may be considered a "single employer, or an "integrated enterprise" or when one company controls another such as they can be said to have acted as a "joint employer" of the employees.  *Id.*

Defendant argues it is not in a direct employment relationship with Plaintiff, but does not argue why any other doctrines of liability do not apply.  Instead, Defendant spends the majority of its briefs arguing that even if it did employ Plaintiff, Plaintiff's claims fail.  Thus, the Court will move to Plaintiff's claims and determine whether if Defendant is Plaintiff's employer, Plaintiff's claims survive the summary judgment standard.

### A.  Disability Discrimination

Plaintiff alleges in Counts I, II, and IX, that Defendant terminated[4] him because of his disability.  (Compl. ¶¶ 14–29, 1(12)–6(12).)[5]  The ADA provides that no employer "shall discriminate against a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).  Under the ADA, a plaintiff can prove a claim of disability discrimination based on direct or indirect evidence." *Holloway v. Kings Dodge, Inc.*, No. 1:16-cv75, 2018 U.S. Dist. LEXIS 63657, at *20 (S.D. Ohio Apr. 16, 2018).  When a plaintiff only has indirect evidence of discrimination, courts evaluate the claim using the *McDonnel-Douglas* burden-shifting framework. *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 735 (6th Cir. 2015).

First, the plaintiff must establish a prima facie case of discrimination by showing: (1) he is disabled; (2) he is otherwise qualified for the position with or without reasonable accommodation; (3) he suffered an adverse employment action; and (4) the employer knew or had reason to know of his disability. *Id.*  If the plaintiff satisfies the prima facie case, "the burden shifts to the defendant to provide a 'legitimate, nondiscriminatory reason' for [the] adverse action." *Id.*  Finally, if the defendant satisfies this burden, it shifts back to the plaintiff who "must present evidence that would allow a jury to find that the defendant's explanation is a pretext for unlawful discrimination." *Id.* "In order to establish pretext, a plaintiff will usually need to show that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Id.* at 741 (internal citations omitted).

---

[4] Plaintiff refers to being terminated while Defendant states Plaintiff was released from his assignment.  This Court will use the terms interchangeably because neither party argues it makes a difference to resolution of Plaintiff's claims.
[5] Beginning on page 9 of the Complaint Plaintiff starts to repeat paragraph numbers.  For paragraphs beginning on page 9 the Court will put the page number in parenthesis to assist in locating which paragraph is being cited.

### 1.  Prima Facie Case

Defendant argues Plaintiff cannot satisfy the second element of the prime facie case because Plaintiff was not qualified for the job.  (Def.'s Mot. Summ. J. at 14.)  "To be 'otherwise qualified' for the job, the employee bears the burden of showing [he] can perform the 'essential functions' of the job, with or without accommodations."  *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018) (citing 42 U.S.C. § 12111(8)).

Defendant contends that Plaintiff's deposition testimony shows he was not qualified for the position.  Plaintiff testified he had never before held a requirements analyst position and instead had lied about his work experience and qualifications on his resume and LinkedIn profile.  (*See* Rodenbeck Dep. 67:5–68:12, 83:7–84:2, 96:17–21, Ex. 3.)  Plaintiff specifically testified that, as to his resume, "[t]he qualification summary is 100 percent inaccurate."  (*Id.* 83:23–24.)

Plaintiff's testimony makes clear that Plaintiff himself did not believe he was qualified for the position and thus, had to lie on his resume to obtain the position.  (*See id.* 67:19–21 (stating that "[i]f [he] wanted to get a job as a requirements analyst, then [he] should create a background as a requirements analyst" and "100 perfect of this is embellished—I would say inaccurate").)  Further, once given the job, Plaintiff was unable to perform the essential functions of the job.  (*See e.g.,* Skoglund Decl. ¶ 3 ("he was not analytically strong or able to develop his own solutions to problems, an essential function of his job"); Blake Decl. ¶ 13 ("Plaintiff was unable to meet the analytical expectations of his job despite ongoing feedback and coaching by his team"); Bull Decl. ¶ 3 (several of Plaintiff's team members complained that Plaintiff's work lacked analytical detail and continued to have many errors"); Cox Decl. ¶¶ 4–5 ("his work lacked analytical detail and contained many errors; his story cards appeared to have been copied and pasted . . . without any independent analysis . . . he would skip steps in the review process" and "Plaintiff's performance

ha[d] so negatively impacted the CSB team that members of the team requested that Plaintiff be removed from a high-profile project the team was working on").)

There is no evidence that had Plaintiff been given any of the three accommodations he sought he would have then been able to perform the essential functions of this position.[6]  First, Plaintiff testified that as an accommodation he requested that his managers excuse his inappropriate behavior.  (*Id.* 185:6–186:12, 220:15–19.)  Plaintiff stated he sought to be excused from "[n]ot thinking before acting, like contacting all these people," and "acting impulsively." (*Id.*)  Even if Defendant had excused this behavior, however, there is no indication that Plaintiff would have been able to perform the essential functions of his job.  While Plaintiff would have been excused from discipline for reaching out to managers for networking opportunities, this would not have affected his ability to perform the analytical portion of his job.

In addition to having his inappropriate behavior excused, Plaintiff requested that his coworkers come directly to him with any performance issues he had.  (*Id.* 220:11–15.)  Again, there is no evidence that this accommodation would have enabled Plaintiff to perform the essential functions of the job.  While it may have prevented managers from learning about his poor performance it would not have enabled Plaintiff to perform the analytical portion of his job.

Finally, Plaintiff requested to work from home.  (*Id.* 220:23–221:3.)  As with the above, there is no evidence that this would have assisted Plaintiff in completing the work.  In fact, it may have negatively impacted the coaching and assistance he was getting, making it more difficult for him to perform his job.  All of Plaintiff's requested accommodations appear to target his behavior in reaching out to managers and leaving his desk for extended periods of time.  They do not,

---

[6] For purposes of this analysis the Court assumes the accommodations Plaintiff sought were reasonable and did not present an undue burden on Defendant.  The Court will address these issues in connection with Plaintiff's claim asserting a failure to accommodate in violation of the ADA.  *See infra* Section III.B.

however, assist Plaintiff in performing the analytical functions of his job, those which Plaintiff was likely unable to perform due to lying on his resume about his previous experience.

In sum, the Court agrees with Defendant that there is no genuine dispute of material fact that Plaintiff was not qualified to perform the essential functions of his position at Nationwide even if given all three requested accommodations.  Plaintiff cannot satisfy the prima facie case.

### 2.    Legitimate Nondiscriminatory Reason

Even if Plaintiff could satisfy the prima facie case, Defendant argues that it has provided a legitimate nondiscriminatory reason for releasing Plaintiff from his position, his performance and behavior issues.  The Court agrees.  Defendant has provided a great deal of evidence indicating Plaintiff had performance deficiencies and engaged in inappropriate behavior.  This evidence includes affidavits, emails, and instant messages from his supervisors and co-workers documenting complaints about his work, long periods spent away from his desk, reaching out to managers in other departments in inappropriate and disruptive ways, spending time on non-work related websites, and continuing to engage in these behaviors after coaching from supervisors.  (*See e.g.,* Rodenbeck Dep. Exs. 14–28; Sayer Aff. ¶¶ 4–6; Blake Decl. ¶¶ 7–10, 13, Exs, A-2–A-4; Skoglund Decl. ¶¶ 3–5, Ex. C-1; Cox Decl. ¶¶ 4–6, Exs. E-1; Bull Decl. ¶ 3, Exs. D-1–D-4.)

Plaintiff does not provide any evidence to contradict Defendant's evidence documenting his poor performance and inappropriate behavior.  Instead, Plaintiff argues that his performance deficiencies and inappropriate behavior should have been excused or disregarded because of his disability.  The Sixth Circuit has determined, from Equal Employment Opportunity Commission ("EEOC") guidance, that "where there has been employee misconduct—including nonviolent disruptive misconduct—the employer may terminate the employee for that behavior, even if it is related to his disability." *Yarberry*, 625 F. App'x at 740 (relying on EEOC guidance stating that

"[t]he ADA does not protect employees from the consequences of violating conduct requirements even where the conduct is caused by the disability") (citing U.S. Equal Emp. Opportunity Comm'n, Guidance on the Americans with Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities, 2008 WL 4786697, at *9 (Sept. 5, 2008)); *see also Sper v. Judson Care Ctr., Inc.*, 29 F. Supp. 3d 1102, 1110 (S.D. Ohio 2014) ("So long as the employee's misconduct is related to the performance of her job, an employer may terminate the employee even if her misconduct was caused by her disability."). The Sixth Circuit stated that employers may enforce conduct rules against employees with disabilities as long as those conduct rules are job-related and consistent with a business necessity. *Yarberry*, 625 F. App'x at 739.

To determine whether an application of a conduct rule to an employee with a disability is job-related and consistent with a business necessity, the Sixth Circuit looks at factors from EEOC guidance. *Id.* These factors include: "the manifestation or symptom of a disability affecting an employee's conduct," "the frequency of occurrences," "the nature of the job," "the specific conduct at issue," and "the working environment." *Id.* (citing 2008 WL 4786697, at *9).

For example, in *Yarberry*, the plaintiff was terminated from his employment after an incident which he asserted his bipolar disorder caused. *Id.* at 740. The plaintiff had entered his employer's store after hours, roamed around, opened a safe, used equipment and left without setting the alarm. *Id.* at 731–32. His employer terminated him the following day. *Id.* at 732. The Sixth Circuit found it concerning that the termination had occurred so quickly after a behavior that happened only once. *Id.* at 740. The Sixth Circuit also noted, however, that the conduct violated many of the company's policies for safety and security. *Id.* The Sixth Circuit concluded that even accepting that the Plaintiff's disability caused the conduct he was terminated for, the employer had a legitimate nondiscriminatory reason for his termination.

This case is similar to *Yarberry*. Plaintiff's persistent networking, although nonviolent, was described by managers as disruptive and aggressive. The conduct occurred numerous times over many months despite being told to stop. Additionally, Plaintiff's time spent away from his desk, as well as his poor work product, negatively affected the other employees on Plaintiff's team causing them to have to make up for his shortcomings. Defendant gave Plaintiff many chances to correct this behavior including offering him coaching, assistance, and a new position. In light of these facts, even if Plaintiff's disability caused the conduct at issue, Defendant's application of the conduct rules to Plaintiff was job-related and consistent with a business necessity. Thus, Defendant had a legitimate nondiscriminatory reason for the termination.

### 3. Pretext

Lastly, Defendant argues there is no evidence its nondiscriminatory reason for releasing Plaintiff was pretextual. The Court agrees. Plaintiff admitted in his deposition his performance was poor. (Rodenbeck Dep. 239:11–13.) There is no evidence to suggest his performance was anything but poor. Plaintiff also admitted in his deposition the reason he was released was his poor performance. (*Id.* 237:23–238:4.) Again, there is no evidence to suggest otherwise. Finally, there is no evidence this was an insufficient ground for dismissal or that he was singled out. On the contrary, Ms. Blake stated she had released at least one other Modis employee for similar reasons. (Blake Decl. ¶ 17.)

In sum, there is no genuine dispute of material fact that Plaintiff cannot make out the prima facie case for disability discrimination, and even if he could, Defendant provided a legitimate nondiscriminatory reason for releasing him and there is no evidence of pretext. Accordingly, Defendant's motion for summary judgment is **GRANTED** as to Counts I, II, and IX.

## B. Failure to Accommodate

Plaintiff alleges in Count VIII that Defendant failed to fulfil his accommodation requests. (Compl. ¶¶ 1(10)–12(11).)  Under the ADA, discrimination includes "a failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'"  *Brumley v. United Parcel Serv. Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (citing 42 U.S.C. § 12212(b)(5)(A)). Failure to accommodate claims necessarily involve direct evidence of the failure to accommodate, and thus, they do not use the *McDonnel-Douglas* burden shifting framework.  *Brown v. Duke Energy Corp.*, No. 1:13cv869, 2019 U.S. Dist. LEXIS 54923, at *40 (S.D. Ohio Mar. 31, 2019) (citing *Brumley*, 909 F.3d at 839).

To establish a failure to accommodate claim, the plaintiff must show: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified, with or without a reasonable accommodation; (3) the defendant knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the defendant failed to provide the necessary accommodation.  *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011); *see also DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004).

The plaintiff has the burden to prove the accommodation is objectively reasonable.  *Wardia v. Justice & Pub. Safety Cabinet Dep't of Juvenile Justice*, No. 12-5337, 2013 U.S. App. LEXIS 238, at *9 (6th Cir. Jan. 3, 2013) (citing *Walsh v. United Serv.*, 201 F.3d 718, 726 n.3 (6th Cir. 2000)).  Once the Plaintiff has satisfied this burden, "the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer."  *Id.*; *see also Johnson*, 443 F. App'x at 983; *Dicarlo*, 358 F.3d at 419.

### 1. Prima Facie Case

Defendant reiterates its argument that Plaintiff cannot make out the prima facie case because he cannot show he was qualified for the Requirements Analyst position.  The Court agrees, for it has already addressed this argument and found no genuine dispute of material fact that Plaintiff was not qualified for the position as a requirements analyst even with the requested accommodations.  *See infra* Section III.A.1.

### 2. Reasonableness of the Requested Accommodations

Even if the Plaintiff were qualified, the Court agrees with Defendant that the requested accommodations are not reasonable.  Plaintiff testified that he made three requests for an accommodation to Nationwide: (1) that his inappropriate behavior be excused; (2) that his co-workers only discuss his performance issues with him; and (3) that he be able to work from home, up to five days per week.  (Rodenbeck Dep. 185:6–186:14, 220:11–15, Ex. 29.)

#### a. Excusing Inappropriate Behavior

Defendant contends excusing Plaintiff's inappropriate behavior is unreasonable because employers are not required to excuse disability related conduct and instead must hold employees to the same standards as non-disabled employees.  (Def.'s Mot. Summ. J. at 19.)  The Court agrees. The Sixth Circuit provided that employers may discipline an employee for misconduct even if it is disability-related conduct.  *Yarberry*, 625 F. App'x at 741–42.  This is particularly true when the behavior is aggressive, disruptive, and continuous, even after coaching.  Plaintiff provides no evidence as to how this accommodation was reasonable and thus has not satisfied his burden.

#### b. Co-workers Discussing Performance Issues Only with Plaintiff

Defendant contends this accommodation suffers from the same unreasonableness as excusing Plaintiff's inappropriate behavior, because it would result in issues never being escalated

to Plaintiff's managers and thus, Plaintiff never being held accountable for his behavior.[7] Defendant's argument is well-taken.  This request has the same result as the previous request.  It would result in Nationwide not holding Plaintiff to the same conduct standards as non-disabled employees.  Plaintiff has not shown this accommodation is reasonable.

### c.  Working from Home

Defendant does not argue Plaintiff's request to work from home was unreasonable and instead argues it was not required to make the accommodation.  Defendant points out that Ms. Blake made the decision to terminate Plaintiff based on conduct occurring prior to the note containing this request, without any knowledge of the note or its request.  (Blake Decl. ¶¶ 14, 16; Rodenbeck Dep. 220:23–221:3.)  Plaintiff only gave the note to Mr. Cary, his coworker, and there is no evidence Mr. Cary gave it to Ms. Blake.  (*Id.*)  Thus, Nationwide argues that "even if this note constituted a reasonable accommodation request, Nationwide was still permitted to follow through on its decision to end Plaintiff's assignment."  (Def.'s Mot. Summ. J. at 20.)

This situation is similar to that of *Yarberry*, where the plaintiff, whom suffered from bi-polar disorder, engaged in terminable conduct and then subsequently requested time off for hospitalization.  625 F. App'x at 729.  The Sixth Circuit noted that had the plaintiff "not already engaged in misconduct meriting termination" the defendant may have been obliged to accommodate him.  *Id.* at 742.  Since, however, the plaintiff committed the terminable misconduct prior to asking for an accommodation, the defendant "was not obligated to rescind [the plaintiff's] termination or engage in further discussion of his requests for accommodation."  *Id.*

---

[7] Defendant also points out Plaintiff's co-workers appeared to agree to Plaintiff's request from their response emails, and there is no evidence they ever escalated an issue to a manager after these emails.  Thus, Plaintiff actually received this accommodation.  Thus, for this requested accommodation Plaintiff cannot satisfy the fifth element of the prima facie case.

*Yarberry* is applicable here.  Plaintiff committed the terminable conduct, which included both poor performance and inappropriate networking, prior to his request for an accommodation to work from home.  Defendant, therefore, was not required to rescind his termination and accommodate him.

In sum, there is no genuine dispute of material fact that Defendant did not violate the ADA by failing to give Plaintiff the accommodations he requested.  Thus, Defendant's motion for summary judgment is **GRANTED** as to Count VIII.

### C. Harassment

Plaintiff alleges in Counts III and IV that Defendant subjected him to harassment causing a hostile work environment. (Compl. ¶¶ 30–45.)  In order to maintain an action for a hostile work environment under the ADA, the plaintiff must show: (1) he was disabled; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment unreasonably interfered with his work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures.  *Trepka v. Bd. of the Cleveland City Sch. Dist.*, 28 F. App'x 455, 461 (6th Cir 2002).  To prevail, the plaintiff must prove "conduct that is 'sufficiently severe or pervasive to alter the conditions to [of his] employment and [to] create an abusive working environment.'"  *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Conduct that is "merely offensive" will not suffice.  *Id.* (citing *Harris*, 510 U.S. at 21).

Defendant argues there is no evidence as to whether there was any harassment, let alone harassment so severe and pervasive that it created an abusive working environment.  (Def.'s Mot. Summ. J. at 22.)  Defendant also contends it is unlikely Plaintiff was being harassed as Plaintiff continuously sought a full-time position with Nationwide and thus, apparently had a strong desire

to work for Defendant full-time.  (*Id.*)  Additionally, Defendant notes that Plaintiff stated in his deposition that the basis for his harassment claim is Defendant's failure to accommodate his disability.  (*Id.*)  Thus, Defendant argues, because there is no genuine dispute of material fact that Plaintiff cannot succeed on his failure to accommodate claim, he also cannot succeed on his harassment claim.  Defendant's arguments are well-taken.

First, the Court agrees that there is no evidence of harassment such as through intimidation, ridicule, or insult.  *See Harris*, 510 U.S. at 21 (noting that sufficiently sever and pervasive intimidation, ridicule or insult can create a claim for a hostile work environment).  The deposition, declarations, affidavits, and other exhibits submitted show no such acts.  Additionally, the Court agrees that it would be odd for Plaintiff to spend so much time trying to gain full-time employment at a workplace permeated by severe and pervasive harassment.

Second, the Court agrees that Plaintiff cannot succeed on this claim by arguing the harassment was Defendant's failure to accommodate.  *See infra* Section III.B (holding there is no genuine dispute of fact that Defendant did not fail to accommodate Plaintiff); *Taylor v. Donahoe*, 452 F. App'x 614, 620 (6th Cir. 2011) (finding Plaintiff's claim of a hostile work environment, based solely on her employer's failure to accommodate her, did not allege facts sufficient to succeed on a hostile work environment claim).

There is no genuine dispute of material fact that Defendant cannot be held liable for harassment.  Defendant's motion for summary judgment is **GRANTED** as to Counts III and IV.

### D.  Retaliation

Plaintiff alleges in Counts V, VI, VII, and IX that Defendant retaliated against him for engaging in protected conduct.  (Compl. ¶¶ 46–59, 1(9)–7(13).)  The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or

practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Like a claim for discrimination, when a plaintiff presents only indirect evidence of retaliation, courts use the *McDonnel-Douglas* framework. *See A.C. v. Shelby Cty. Bd. Educ.*, 711 F.3d 687, 697 (6th Cir. 2013).

First, the plaintiff must prove a prima facie case of retaliation which requires showing: (1) the plaintiff engaged in an activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against Plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014); *Taylor*, 425 F. App'x at 620. "Protected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination." *Id.* (quoting *Goonan v. Fed. Reserve Bank of New York*, 916 F. Supp. 2d 470, 484–85 (S.D.N.Y. 2013)). Requesting an ADA accommodation is also protected conduct. *Brown*, 2019 U.S. Dist. LEXIS 54923 at *40 (citing *A.C.*, 711 F.3d at 698).

If the plaintiff satisfies the prima facie case, the defendant must present a legitimate nondiscriminatory reason for the adverse action. *Geiger v. Pfizer, Inc.*, No. 2:06-cv-636, 2008 U.S. Dist. LEXIS 89238, at *17–18 (S.D. Ohio Sept. 18, 2008) (citing *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997)). Finally, if the defendant satisfies this burden, the plaintiff bears the ultimate burden of proving the proffered reason for the action is merely a pretext for discrimination. *Id.* at *18 (citing *Penny*, 128 F.3d at 417).

Plaintiff alleges four different adverse employment actions. (*See* Compl. ¶¶ 50, 57, 5(9), 5(12).) Two of these actions, a hostile work environment and a failure to accommodate, have already been addressed. The Court found there is no genuine dispute of material fact that Plaintiff

was not subjected to a hostile work environment and Defendant did not fail to accommodate Plaintiff.  *See infra* Sections III.B, C.  Thus, these two actions cannot be the basis for element four of the prima facie case.  Plaintiff also alleges Defendant retaliated against him by terminating his employment and by failing to hire him for a full-time position.  The evidence shows Defendant did release Plaintiff and subsequently failed to hire him.  Plaintiff, thus, states two claims for retaliation and the Court will address them separately.

### 1.    Retaliation through Termination of Plaintiff's Employment

Plaintiff claims retaliation based on three instances of protected conduct: (i) filing charges with the OCRC; (ii) requesting accommodations; and (iii) opposing discrimination and harassment.

Defendant argues filing charges with the OCRC cannot satisfy the prima facie case because when plaintiff was released from his position, he had not yet filed the charges.  Thus, the employer did not have knowledge of the protected activity.  The Court agrees.  Defendant could not retaliate against Plaintiff for protected conduct through termination which it did not know about it when it terminated him.  *See Hopkins v. Canton City Bd. of Educ.*, 477 F. App'x 349, 361 (6th Cir. 2012) (noting that decisionmakers cannot retaliate when they are unaware of the protected conduct and thus, finding no retaliation when there was no evidence the defendant knew about the plaintiff's OCRC complaint when they decided not to hire him); *Watson v. Ohio Dep't of Rehab. & Corr.*, 167 F. Supp. 3d 912, 936 (S.D. Ohio 2016) (noting that there is no causation when decision-makers are unaware of a plaintiff's protected activity).  Thus, Plaintiff cannot satisfy the prima facie case using the filing of charges as the protected conduct.

Similarly, Defendant argues Plaintiff's third accommodation request, to work from home, cannot satisfy the prima facie case because Ms. Blake did not know about this request when she

decided to release Plaintiff. The Court agrees. Ms. Blake decided to terminate Plaintiff without knowledge that he had sought to work from home, and thus, this cannot satisfy the prima facie case. *See Hopkins*, 477 F. App'x at 361.

As to the remaining two requests for accommodations, Defendant argues there is no causal connection between those requests and Defendant's decision to terminate Plaintiff. Defendant notes that Plaintiff's performance issues began well before he requested accommodations. Further, his performance and behavioral issues continued long after he requested accommodations. Plaintiff points to an email from Ms. Blake which contends that Plaintiff's request to his co-worker asking him to come to Plaintiff with problems is "disturbing." (Pl.'s Resp. at 4.) Plaintiff argues that because Ms. Blake found his request for an accommodation "disturbing" she did "everything in her power to find a way to terminate [him.]" (*Id*. at 2.)

This Court has previously stated that to satisfy a causal connection the plaintiff "must establish that nothing he did, such as poor performance or attitude, precipitated the adverse employment action." *Merendo v. Ohio Gastroenterology Grp., Inc.*, No. 2:17-cv-817, 2019 U.S. Dist. LEXIS 31507, at *57 (S.D. Ohio Feb. 27, 2019) (internal citations omitted). Here, Plaintiff has not established this, and the overwhelming evidence indicates that Defendant terminated Plaintiff because of his poor performance. This evidence includes Plaintiff's own deposition testimony stating that he was terminated because his performance was poor. (Rodenbeck Dep. 237:23–238:4.)

There is a somewhat close temporal proximity between some of the requested accommodations, such as the emails to co-workers Dana Logan and Dana Bull, and Plaintiff's termination. The temporal proximity, however, was not immediate and thus, in order to create a causal connection, it must be coupled with some other indicia of retaliatory conduct. *Merendo*,

2019 U.S. Dist. LEXIS 31507 at *58; *see Schwendeman v. Marietta City Schs.* No. 2:18-cv-588, 2020 U.S. Dist. LEXIS 19052, at *49 (S.D. Ohio Jan. 31, 2020) (finding the temporal proximity between the filing of discrimination charges and the plaintiff's termination insufficient to show causation because the time between the two was not immediate and there was no other indicia of retaliatory conduct); *McCoy v. Residential Prop. Mgmt.*, No. 2:14-cv-2642, 2016 U.S. Dist. LEXIS 7733, at *21–22 (S.D. Ohio Apr. 8, 2016) (finding a gap in time between the plaintiff's complaints and his transfer and no other indicia of retaliatory conduct and thus no causation).

The only other potential retaliatory conduct Plaintiff provides is Ms. Blake's use of the word "disturbing" in an email.  Ms. Blake testified that she made this comment because she "viewed Plaintiff's request that his co-workers essentially hide his poor performance and mistakes as patently unreasonable."  (Blake Suppl. Decl. ¶ 6.)  There is simply no evidence that Ms. Blake proceeded to do everything she could to terminate Plaintiff, as Plaintiff contends.  In fact, Ms. Blake repeatedly gave Plaintiff second chances after complaints of poor behavior.  Thus, because the temporal proximity was not immediate and there is no other indicia of retaliation, Plaintiff has not shown causation between his termination and his request for accommodations.

Finally, Plaintiff's Complaint alleges he also opposed discrimination and harassment. Neither party addresses this point in their briefs.  This is likely because it is not supported by the evidence.  There is no indication that Plaintiff way opposed any of Defendant's conduct and further, there has been no showing of any discrimination or harassment to which Defendant could oppose.  Thus, this alleged conduct cannot satisfy the prima facie case.

In sum, Plaintiff cannot show a prima facie case for a retaliation claim based on his termination.  The Court need not go further to address Defendant's legitimate nondiscriminatory reason or pretext, for even if Plaintiff could show the prima facie case, these analyses would be

the same in connection with Defendant's claim of discrimination.  *See infra* Section III.A.2–3.
The Court already found there is no genuine dispute of material fact that Defendant provided a
legitimate non-discriminatory reason for releasing Plaintiff and Plaintiff provided no evidence of
pretext.  Plaintiff cannot make out a claim for retaliation based on his termination.

### 2.  Retaliation through Failure to Hire

For Plaintiff's claim of retaliation based on Defendant's failure to hire him, Plaintiff alleges
the same three instances of protected activity: (i) filing charges with the OCRC; (ii) requesting
accommodations; and (iii) opposing discrimination and harassment.

Defendant argues that for all three instances of protected activity Plaintiff cannot establish
the second element of the prima facie case, that Defendant knew of the activity.  Ms. Rhubottom
was the recruiter for both of the jobs Plaintiff asserts he was not hired for in retaliation for his
engagement in protected activity.  (Rhubottom Decl. ¶¶ 3, 6.)  Ms. Rhubottom stated that prior to
rejecting Plaintiff for both positions she was not aware of his disability, that he had filed a charge
of discrimination against Nationwide, or that he had otherwise engaged in protected activity.  (*Id.*
¶¶ 5, 8.)  There is no evidence that disputes these facts.  Thus, the Court agrees with Defendant
that Plaintiff cannot satisfy the second element of the prima facie case.  *See Brown*, 2019 U.S.
Dist. LEXIS 54923 at *42 (finding that because the plaintiff did not present evidence showing the
hiring managers knew she had previously asked for accommodations due to her disability, she
could not establish the prima facie case).

Additionally, even if Plaintiff could satisfy the prima facie case, Defendant has articulated
a legitimate nondiscriminatory reason for not hiring Plaintiff.  Ms. Rhubottom explains that she
reviewed Plaintiff's credentials, compared them to the minimum qualifications for the positions
he was applying for and determined that Plaintiff did not meet these minimum qualifications.

(Rhubottom Decl. ¶¶ 3, 6.)  Ms. Rhubottom also includes in her declaration the resumes of the individuals who were chosen for the positions to show their greater qualifications and experience as compared to Plaintiff.  (*See id.* ¶¶ 4,7, Exs. F-1, F-2.)  This is sufficient to show a legitimate nondiscriminatory reason for not hiring Plaintiff.

Finally, Plaintiff has provided no evidence of pretext.  All the evidence in the record indicates Plaintiff was not chosen because he was not qualified, and this is a sufficient reason to justify not hiring an applicant.

In sum, there is no genuine dispute of material fact that Defendant did not retaliate against Plaintiff for his participation in a protected activity when it terminated him or when it did not hire him for a full-time position.  Defendant's motion for summary judgment is **GRANTED** as to Counts V, VI, VII, and IX.

## IV.

In addition to Defendant's motion for summary judgment, pending before the Court is Plaintiff's motion for a jury trial.  (Pl.'s Mot. Req. Jury Trial, ECF No. 43.)  In this motion Plaintiff states he would like the Court to set the case for a jury trial so that he can plead his case.  (*Id.*)

As the Court stated earlier in this Opinion, the Court is sensitive to the fact that Plaintiff is proceeding as a pro se litigant.  This motion, however, presents no legal basis for giving Plaintiff a jury trial in light of the fact that the Court has found there is no genuine dispute of material fact that Defendant cannot be held liable for any of the Complaint's nine counts.  This Court has previously recognized that "[e]ven when the plaintiff is a pro se litigant, he is required to comply with the rigors of summary judgment, as '[p]ro se plaintiffs are not automatically entitled to take every case to trial.'"  *Milton v. City of Columbus*, No. 2:09-cv-114, 2011 WL 13302720, at *3

(S.D. Ohio Mar. 31, 2011) (quoting *Price v. Caruso*, 451 F. Supp. 2d 889, 893 (E.D. Mich. 2006)).

Plaintiff's motion for a jury trial is **DENIED**.


## V.

In sum, Defendant's Motion for Summary Judgment (ECF No. 37) is **GRANTED**.

Additionally, Plaintiff's Motion Requesting a Jury Trial (ECF No. 43) is **DENIED**. The Clerk is

**DIRECTED** to close this case.

**IT IS SO ORDERED.**

**5/8/2020**                                            **s/Edmund A. Sargus, Jr.**
**DATED**                                                     **EDMUND A. SARGUS, JR.**
                                                         **UNITED STATES DISTRICT JUDGE**